L. H. MILLER, George M. Miller, and A. S. Miller, Respondents, v. J. M. THOMPSON and Devils Lake State Bank, a Corporation, Defendants and J. M. Thompson.

(157 N. W. 677.)

**Corporate stock — contract of sale — action to rescind — evidence — laches — estoppel.**

Action to rescind a contract of sale of corporate stock. Evidence examined and *held*:

That upon plaintiffs' testimony they are estopped by their own laches from rescinding the contract.

Opinion filed March 25, 1916. Rehearing denied April 27, 1916.

Appeal from the District Court of Ramsey County, *Bultz*, J. Reversed.

*Cuthbert & Smythe*, for appellant.

The complaint does not show facts constituting a cause of action.

If plaintiff's cause be an action at law, there is no allegation of rescission. If an equitable action, there is no such allegation, nor any showing that plaintiff is ready, willing, and able to rescind. Iowa Nat. Bank v. Sherman, 23 S. D. 8, 119 N. W. 1010; Lovell v. McCaughey, 8 S. D. 471, 66 N. W. 1085; Coplay Iron Co. v. Pope, 108 N. Y. 232, 15 N. E. 335; Note to Katz v. Bedford, 1 L.R.A. 826; Liland v. Tweto, 19 N. D. 551, 125 N. W. 1032; J. L. Owens Co. v. Doughty, 16 N. D. 10, 110 N. W. 78; Spoonheim v. Spoonheim, 14 N. D. 380, 104 N. W. 845; Dowagiac Mfg. Co. v. Mahon, 13 N. D. 523, 101 N. W. 903.

The stock of goods received by plaintiffs should have been returned by them before action, and their failure in this respect estopped them to bring action. 4 Thomp. Corp. pp. 3480, 3484; Rev. Codes 1905, § 5380, Comp. Laws 1913, § 5936.

It is immaterial whether or not the appellant was guilty of fraud. Fraud does not rescind a contract. It is merely a ground for rescission. To rescind, the party must return everything of value. McMahon v. Plummer, 6 Dak. 42, 50 N. W. 480; Bassett v. Brown, 105 Mass. 551; Conner v. Henderson, 15 Mass. 319, 8 Am. Dec. 103;

Morse v. Brackett, 98 Mass. 205; Eastabrook v. Swett, 116 Mass. 303; Snow v. Alley, 144 Mass. 546, 59 Am. Rep. 119, 11 N. E. 764.

Plaintiffs cannot retain the property acquired from defendant, and by a rescission secure a reconveyance of all the property transferred by them in part consideration therefor. Lovell v. McCaughey, 8 S. D. 471, 66 N. W. 1085; Anderson v. First Nat. Bank, 4 N. D. 192, 59 N. W. 1029; Comp. Laws 1913, §§ 3589, 3591; Northwestern Mut. Hail Ins. Co. v. Fleming, 12 S. D. 36, 80 N. W. 147; Smith v. Detroit & D. Gold Min. Co.. 17 S. D. 413, 97 N. W. 19; Iowa Nat. Bank v. Sherman, 23 S. D. 8, 119 N. W. 1010; Liland v. Tweto, 19 N. D. 551, 125 N. W. 1032; J. L. Owens Co. v. Doughty, 16 N. D. 10, 110 N. W. 78; Spoonheim v. Spoonheim, 14 N. D. 380, 104 N. W. 845; Dowagiac Mfg. Co. v. Mahon, 13 N. D. 523, 101 N. W. 903. ·

Plaintiff's remedy, if any, was to sue for a breach of the contract. Rutland Marble Co. v. Ripley, 10 Wall. 353, 19 L. ed. 960, 3 Mor. Min. Rep. 291.

Certificates in the stock of a corporation while looked upon as property mainly for taxation purposes, yet they are not the stock, the goods and chattels, the property,—that which is really bought and sold. They are merely evidence of interests in the corporation. 4 Thomp. Corp. §§ 3470, 3471, 3480; Ex parte Willcocks, 7 Cow. 402, 17 Am. Dec. 525; Vail v. Hamilton, 85 N. Y. 453; Mitchell v. Beckman, 64 Cal. 117, 28 Pac. 110; Evans v. Bailey, 66 Cal. 112, 4 Pac. 1089; State v. Ferris, 42 Conn. 560; McNeil v. Tenth Nat. Bank, 46 N. Y. 325, 7 Am. Rep. 341.

Further, one may be a stockholder and his liability just as fixed as though the certificate had been issued and delivered without such issuance and delivery. Barron v. Burrill, 86 Me. 66, 29 Atl. 939; Holland v. Duluth Iron Min. & Development Co. 65 Minn. 324, 60 Am. St. Rep. 480, 68 N. W. 50; Richardson v. Busch, 198 Mo. 174, 115 Am. St. Rep. 472, 95 S. W. 894; Hutchins v. State Bank, 12 Met. 421; Mechanics' Bank v. New York & N. H. R. Co. 13 N. Y. 627; Angell & A. Priv. Corp. § 560; Jellenik v. Huron Copper Min. Co. 177 U. S. 13, 44 L. ed. 651, 20 Sup. Ct. Rep. 559; 1 Cook, Corp. §§ 13, 485–488, inclusive; First Nat. Bank v. Holland, 99 Va. 495, 55 L.R.A. 155, 86 Am. St. Rep. 898, 39 S. E. 126; Basket v. Hassell, 107 U. S. 602, 27 L. ed. 500, 2 Sup. Ct. Rep. 415.

Plaintiffs took possession of the property of the corporation and retained same and exercised ownership over it, until it was lost, destroyed, or dissipated, and not even an offer of return of any of it. No matter what its value, they should have returned it, or shown an offer to return and refusal to accept. Blackburn v. Smith, 2 Exch. 783, 18 L. J. Exch. N. S. 187; Reed v. Blandford, 2 Younge & J. 278; Pharr v. Bachelor, 3 Ala. 245; State v. McCauley, 15 Cal. 458; Christy v. Arnold, 4 Ariz. 263, 36 Pac. 918; Shively v. Semi-Tropic Land & W. Co. 99 Cal. 259, 33 Pac. 848; Cleary v. Folger, 84 Cal. 316, 18 Am. St. Rep. 187, 24 Pac. 280; Moore v. Bare, 11 Iowa, 198; Murphy v. Lockwood, 21 Ill. 611; Gehr v. Hagerman, 26 Ill. 441; Wheeler v. Mather, 56 Ill. 241, 8 Am. Rep. 683; Wolf v. Dietzsch, 75 Ill. 205; Chance v. Clay County, 5 Blackf. 441, 25 Am. Dec. 131; Hendrickson v. Hendrickson, 51 Iowa, 68, 50 N. W. 287; Johnson v. Jackson, 27 Miss. 498, 61 Am. Dec. 522; Randlet v. Herren, 20 N. H. 102; Getchell v. Chase, 37 N. H. 110; Ayer v. Hawkes, 11 N. H. 148; Doughten v. Camden Bldg. & L. Asso. 41 N. J. Eq. 556, 7 Atl. 479; Pittsburgh & N. A. Turnp. Road Co. v. Com. 2 Watts, 433.

The plaintiffs here are estopped by their long acquiescence. Lowber v. Selden, 11 How. Pr. 526; 2 Pom. Eq. Jur. 499, 500; Cholmondeley v. Clinton, 2 Meriv. 171, 2 Jac. & W. 1, 4 Bligh, N. R. 1; Honner v. Morton, 3 Russ. Ch. 65, 27 Revised Rep. 15; Selsey v. Rhoades, 1 Bligh, N. R. 1, 30 Revised Rep. 1; Vigers v. Pike, 8 Clark & F. 650; Charter v. Trevelyan, 11 Clark & F. 714, 8 Jur. 1015; Odlin v. Gove, 41 N. H. 465, 77 Am. Dec. 773; Bassett v. Salisbury Mfg. Co. 47 N. H. 439; Peabody v. Flint, 6 Allen, 52; Fuller v. Melrose, 1 Allen, 166; Tash v. Adams, 10 Cush. 252; Briggs v. Smith, 5 R. I. 213; Cobb v. Hatfield, 46 N. Y. 533; Lawrence v. Dale, 3 Johns. Ch. 23; M'Neven v. Livingston, 17 Johns. 437.

They are estopped because the parties are not left *in statu quo.* Clarke v. Dixon, 27 L. J. Q. B. N. S. 223, El. Bl. & El. 148, 4 Jur. N. S. 832.

They are estopped for laches. A defrauded party has but one election to rescind, and he must use that promptly upon discovering the fraud, and when once he has elected, he must abide by his decision. Bigelow, Fr. 436, 438; Williamson v. New Jersey Southern R. Co.

34 N. D.—5.

29 N. J. Eq. 319; Brown v. Mutual Ben. L. Ins. Co. 32 N. J. Eq.
809; Oakey v. Cook, 41 N. J. Eq. 350, 7 Atl. 495; 2 Pom. Eq. Jur.
§ 817; Baird v. New York, 96 N. Y. 567; Farlow v. Ellis, 15 Gray,
229; Lawrence v. Dale, 3 Johns. Ch. 23; M'Neven v. Livingston, 17
Johns. 437; Morgan v. McKee, 77 Pa. 231, 3 Mor. Min. Rep. 128;
Pearsoll v. Chapin, 44 Pa. 9; Negley v. Lindsay, 67 Pa. 217, 5 Am.
Rep. 427; Leaming v. Wise, 73 Pa. 173, 7 Mor. Min. Rep. 41;
Knuckolls v. Lea, 10 Humph. 577; Bassett v. Brown, 105 Mass. 551;
1 Story, Eq. Jur. 13th ed. 227; 2 Kent. Com. 11th ed. 637; Vigers
v. Pike, 8 Clark & F. 562; Schiffer v. Dietz, 83 N. Y. 300.

*W. M. Anderson,* for respondents.

Failure to appeal for an order denying a new trial leaves such order
*res judicata* as to all error that might have been urged against it.
Hedderich v. Hedderich, 18 N. D. 488, 123 N. W. 276.

This is an equity case which was tried by a jury, and therefore it
becomes a law case. Peckham v. Van Bergen, 8 N. D. 595, 80 N. W.
759; Comp. Laws 1913, § 7846; Merritt v. Adams County Land &
Invest. Co. 29 N. D. 496, 151 N. W. 11.

Restoration means to turn back that which one receives. In this
case it is what was received from Thompson, and not that which was
received from the directors, that should be returned. Comp. Laws
1913, subdiv. 2 of § 5936.

Title is transferred by an executory contract for the sale or exchange
of personal property only when the buyer has accepted the thing, or
when the seller has completed it, prepared it, and offered it to the
buyer, with intent to transfer the title. Comp. Laws. § 5536.

Payments made prior to discovery of fraud do not prevent rescis-
sion. Grewing v. Minneapolis Threshing Mach. Co. 12 S. D. 127, 80
N. W. 176.

BURKE, J. The decision in this case rests upon a careful analysis
of the facts. These are complicated, but not largely in dispute. The
Anderson Mercantile Company was a corporation operating a general
store at the village of Penn, North Dakota. Defendant is a banker of
Devils Lake. The three plaintiffs lived near Penn. L. H. Miller, the
father, had been in business in Grand Harbor for about fifteen years,
but had later located upon a farm 4 miles from Penn, and he and one

of his sons, Alfred, engaged in the hardware business at Penn thereafter. The father testifies that he understood bookkeeping in his own way, and had kept the books when he was in business. One of the sons, Alfred, also a plaintiff, had been in partnership with his father in the hardware business about a year at the time the transactions involved in this suit took place. The other son, George, had worked in the mercantile business about eight years at Grand Harbor. The defendant, or his bank, had acquired fifty shares of the capital stock of the Anderson Mercantile Company as collateral to a loan made to a former manager of the company. The fifty shares were a majority of the whole stock, which consisted of eighty-eight or eighty-nine shares. A sale was finally effected of those fifty shares of stock to the three plaintiffs by the defendant, October 6, 1910. As this suit is an attempt to rescind said contract of sale, it becomes important to study said negotiations. We cannot set out all of the testimony, of course, and it is hard to set out extracts without appearing to do an injustice to one of the parties. We are therefore obliged to give somewhat our version of the conversations, supplemented by quotations from the testimony. Alfred Miller testified that Thompson came to him and offered him the stock and showed him an invoice of the goods belonging to the Mercantile Company and a list showing its debts. He testifies that defendant told him the shares were worth 65 cents on the dollar. Upon cross-examination he states that the negotiations had extended over quite a period of time, and that he and his father and brother had consulted about the proposition on one or more occasions. That he had been in the store frequently, and knew something at least about the business. He says that defendant stated as follows: "He said the liabilities had been reduced from $9,500 to $6,500. . . ." and: "He says 'you aren't taking any chances whatever as we are responsible.' " The other brother, George, testifies to the same conversation.

Upon cross-examination he stated:

Q. Mr. Thompson did tell you, did he not, that there might have been accounts outstanding that he had not gotten, but if there were he would be responsible for it? . . . That if there was anything over $6,500 indebtedness that he would be responsible for it?.

A. Well, I do not know as he said it that way.

Q. Well, that was the substance of what he said, was it not?

A. To a certain extent.

Q. Didn't Mr. Thompson tell you right there that night (at a later date) that he stood ready to make good for any accounts that figured up, on the 5th of October, 1910, to over $6,500?

A. I do not remember.

Q. He has told you that several times, has he not?

A. Well, to a certain extent he has.

Q. He has told you every time you talked to him about this indebtedness, has he not?

A. Yes, but he has never told us he would make it all good.

And then on redirect examination he states, being examined by his own attorney:

Q. And when was it that he stated he would make good everything? Every item over $6,500 on indebtedness?

A. Well, that was the understanding all the time, that he was supposed to make good.

Q. Was it after or before this stock was sold?

A. As I take it, it was before and after. . . . The only time I remember of distinctly is before.

Q. And what did he say then?

A. Well, he said that anything that came up afterwards that they would make good. . . . He says that we were absolutely taking no chances at that time.

Q. And that they would make good?

A. Yes, sir.

The father also testifies to this conversation, and in substance said the same as the boys:

Q. He (Thompson) also told you in that conversation that there might be some other bills out that he did not know about,—he said that, did he not?

A. I do not remember that, no.

Q. You would not swear he did not say that, would you?

A. No, I would not say he did not, but I don't remember it.

Q. And he told you this was a safe deal, that if there was more than $6,500 debts he would make good, did he not? That he would pay it?

A. Yes, sir, he said that. He said, "We are good for it if there is anything wrong about it." . . .

Q. The fact is, it is not, that when he was talking about this $6,500, he told you there might be other bills that he had not got hold of?

A. I do not remember him mentioning that.

. . . . . . . . . . . . . . . . . . . . . .

Q. And he told you he was financially good in that; if there was anything wrong with this statement he would make it good?

A. I think he mentioned that he would make it good.

Mr. Thompson, defendant, offered no testimony at the trial. We will, therefore, for the purposes of this opinion, assume that the testimony of the plaintiffs is true regarding this feature of the case. No cash was paid for the stock, but two notes of $1,500 each were signed by the three plaintiffs and given to defendant. The actual shares of stock, however, were not delivered, it being defendant's theory that they were held as collateral to the notes, and plaintiffs claiming that when those shares were demanded defendant stated that he could not find them upon the moment, and put off their delivery from time to time upon this excuse.

At all events, plaintiffs entered into possession of the store and ran the same until the last part of January, 1912, when it went into the hands of a receiver. In the meantime a dispute had arisen as to the amount of the debts of the mercantile company. A careful examination of the testimony convinces us that this dispute occurred within a month after the sale, and continued at intervals during a period of nearly a year. Further we do not believe there was satisfactory evidence offered showing that the $6,500 limit was much exceeded. The two boys worked continuously in the store, and the father came in frequently to inquire about the business. It is the contention of plaintiffs that the books of the mercantile company nowhere showed the indebtedness of the concern, and that for this reason they did not immediately learn of the false representation made to them regarding the debts. Here again an examination of the testimony convinces us that as early as November 7, 1910, a month and a day after the sale, plaintiffs were in

possession of a complete list of the indebtedness of the mercantile company.

Upon cross-examination Alfred testifies:

Q. Now, refresh your memory and state if you paid the Janney, Semple, Hill, & Company's note on November 7, 1910.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

Q. So, as early as November 7, 1910, you had noticed that there were some outstanding accounts that were not included in the invoice, and you went immediately down to Mr. Thompson to see about it?

A. Well, we did not know for sure.

Q. Well, you went to see Mr. Thompson about it, did you not?

A. Yes, sir.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

Q. Now, you had received statements from practically all of the wholesale houses at that time, had you not?

A. No, I do not believe we had.

Q. Well, you received statements from every wholesale house unless there was some, where there was a note given?

A. Yes.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

Q. And you were receiving statements from that right along, were you not?

A. I do not just remember about that at all.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

Q. You took all of the wholesale houses that had accounts outstanding and took those bills—now did you find that the indebtedness exceeded $6,500?

A. Yes, sir.

It is thus evident that as early as November 7, 1910, plaintiffs claimed that the indebtedness exceeded the sum of $6,500. This is an important fact because no effort was made to rescind, on this ground at least, until one year two months and nineteen days thereafter, at a time when the mercantile company had become insolvent. Plaintiffs had also furnished evidence, at the time the mercantile company was turned over to them there was $800 in the bank to its credit. Thus, of the year and three months the plaintiffs were in control of the store,

all but about a month of that time they were aware of the ground which they now claim entitles them to rescind, but they took no action. This is the only inference that can be drawn from the testimony as a whole. We are not going to give the evidence regarding the disputes between plaintiffs and defendant that occurred during the year and three months of their ownership, but to show that this is the principal ground of complaint, we quote from the testimony of the son George:

Q. You accepted the invoice of August 3, did you not?
A. Yes, sir.
Q. Was it a correct invoice?
A. Yes, sir.
Q. And you never had any cause to complain about that?
A. No, we never made any complaint about that.
Q. The merchandise was all there that he represented to be there?
A. Yes.
Q. So the only complaint that you had was that there was a larger indebtedness outstanding than $6,500? That was your only complaint, was it not?
A. Well, we claimed,—our complaint was, that there was several items on it that he did not have on his statement.
Q. And that these items made the indebtedness more than $6,500?
A. Yes, sir.

The evidence also shows that Thompson at all times insisted that the indebtedness was not more than $6,500, but that if it was he would pay the overplus. January 28, 1912, after the mercantile company had gone into the hands of a receiver, two of the plaintiffs called upon defendant and demanded their notes.

The father testifies:
Q. Do you remember what date it was?
A. That was January 28th.

Q. Who did you come with then?
A. George.
Q. Had you consulted a lawyer in the meantime?
A. Well, I think we had. Yes.

Q. After you had consulted your lawyer, then you went down and demanded your notes, did you not?

A. Yes, sir.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

Q. That is the time you told Mr. Thompson you did not think you got a consideration for the notes?

A. Yes.

In their brief plaintiffs state that the grounds of the rescission were as follows: "The plaintiffs claimed that Thompson agreed to sell fifty shares of stock in the Anderson Mercantile Company, and represented that it had an indebtedness of $6,500, and that that was all of the indebtedness that was against the company at the time, with the exception of two or three small accounts that did not amount to anything and were of no consequence; whereas, in truth and in fact, the indebtedness was much larger. That it amounted to something like $1,700 more at the time the deal was closed, and that the notes amounting to $3,000 were delivered to the defendant Thompson and the Devils Lake State Bank, with the agreement that the defendant was to deliver to them fifty shares of stock in the Anderson Mercantile Company, and that no stock had ever been delivered to them, although they had from time to time made a demand for this stock, and that the defendants had failed, neglected, and refused to deliver it to them; so that the issues presented by the complaint for the rescission are: First, fraud in misrepresenting the condition of the indebtedness; and, secondly, an absolute failure of consideration in not delivering the shares of stock to them. The case was brought on for trial, and was concededly an equity case. The trial judge, however, announced that he would call a jury to whom he would submit certain disputed questions of fact. Defendant objected to the jury upon the grounds that the same would deprive him of a trial *de novo* under the Newman act in the supreme court, because all of the evidence would not be received. He also objected to the jury upon the grounds that there were, or probably would be, no disputed questions of fact, only questions of law, and upon the grounds that the nature of the case was such that a jury could not be of any assistance. We prefer, however, to place our decision upon other grounds, thus ending the litigation. As already stated, the defendant offered no testimony. There was therefore no dispute as to the facts. The court, nevertheless, submitted six questions

to the jury which the defendant insists were questions of law. Upon the answer of these questions a rescission was ordered. Defendant appeals, specifying numerous errors. Several questions of practice have already arisen and been decided in this case, and we will give no further consideration to those technicalities. For the same reason we will not discuss defendant's contention that the complaint does not state a cause of action, nor the questions which he raises as to the impropriety of submitting questions of law to the jury for answer.

(1) An important point and one that will end the litigation will be taken up and decided. Accepting the testimony of the plaintiffs as true, it, to our mind, shows conclusively that they were estopped from rescinding the contract by their own laches. They acquiesced in the contract, and continued in possession of the store for more than a year after they learned that the indebtedness exceeded the amount represented, and for the same period after the defendant had neglected and refused to turn over to them the actual shares of stock. They sold goods from the store, and used up the $800 that had been left on deposit, and ran the business into bankruptcy before making their formal rescission. The father even paid $500 upon one of the $1,500 notes, and the interest on the other, and renewed the same. Upon this occurrence the defendant released the two sons from further obligation upon that note. They made no attempt to restore to the defendant the business in the condition in which they had received it. In fact, they could not have done so had they tried. They therefore could not rescind. This is elementary. 2 Pom. Eq. Jur. 499, 500; Clarke v. Dixon, 27 L. J. Q. B. N. S. 223, El. Bl. & El. 148, 4 Jur. N. S. 832; Oakey v. Cook, 41 N. J. Eq. 350, 7 Atl. 495; Rosenwater v. Selleseth, 33 N. D. 254, 156 N. W. 540.

The judgment of the trial court is reversed and the case is ordered dismissed.

CHRISTIANSON, J., disqualified; HANLEY, District Judge, sitting by request.

On Petition for Rehearing, filed April 27, 1916.

Upon petition for rehearing respondent insists that this court has no right to consider the insufficiency of the evidence because this appeal is

from the judgment, and not from the order denying appellant's motion
for a new trial. We are cited to Hedderich v. Hedderich, 18 N. D.
489, 123 N. W. 276. An examination of this case, however, not only
does not support respondent's contention, but shows exactly the op-
posite. At page 492 of the state report we find the following language:
"It is respondent's contention that, in view of the fact that appellant
urged on his motion for a new trial all the questions now urged on the
appeal from the judgment, that the order denying such motion is, in
effect, *res judicata,* and can be reveiwed by this court only on an appeal
from the order. Numerous cases are cited and relied upon in support
of such contention, but we find none directly in point, and we have
been unable, through an extended research, to find any authority for
such a rule. . . . (page 493) Our conclusion, therefore, is that
the appeal from the judgment presents to this court the alleged errors
of law occurring at the trial as preserved in the judgment roll, although
such alleged errors were also urged as grounds for a new trial in the
court below, and the order denying such new trial is unappealed from."

The petition for rehearing is denied.